IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge William J. Martínez**

Criminal Case No. 12-cr-0138-WJM

UNITED STATES OF AMERICA

      Plaintiff,

v.

KENNETH ROYAL WHEELER

      Defendant.

---

## ORDER DENYING DEFENDANT'S MOTION TO DISMISS INDICTMENT

---

In a Superseding Indictment returned by the grand jury on May 21, 2013, Defendant Kenneth Royal Wheeler was charged with two counts of transmitting threats in foreign commerce in violation of 18 U.S.C. § 875(c), based on comments he made in Facebook posts while traveling abroad in Italy during March 2012.  (ECF No. 114.)  A jury trial on these charges was held on September 23-26, 2013.  (ECF Nos. 171, 174, 179 & 181.)  Defendant was convicted on both counts, and his sentencing is scheduled for January 15, 2014.  (ECF No. 181.)

During trial, Defendant made an oral motion to dismiss the indictment ("Motion") as a sanction for the mid-trial disclosure of a backup recording of the Defendant's statement to investigators.  After extensive discussion with the parties, the Court reserved ruling on the motion pending the jury's verdict.  For the reasons set forth below, the Court now denies the Motion.

## I.  BACKGROUND AND PROCEDURAL HISTORY

On the second day of trial, the Government called Special Agent Gerard

Kavanagh, its case agent, to testify.  (ECF No. 174.)  Agent Kavanagh was one of the officers who arrested Defendant at the Grand Junction airport upon his return to the United States.  (ECF No. 199 at 62.)  Agent Kavanagh transported the Defendant to the Grand Junction Field Office, where he was interviewed.  (*Id*. at 63.)  During Agent Kavanagh's testimony on direct examination, an audio recording of Defendant's interview was played to the jury ("First Recording").  (*Id*. at 66.)  During this interview, Defendant admitted authoring the Facebook posts which contained the allegedly threatening statements.

During cross-examination, Agent Kavanagh admitted that the audio recording equipment was not activated at the beginning of his interview with the Defendant at the Field Office.  (*Id*. at 68.)  Agent Kavanagh then testified that there was a "backup recording" (the "Second Recording") that had started to record statements made that day at the Field Office before the First Recording was initiated.  (*Id*. at 69.)  Abraham Hutt, Defendant's attorney, informed the Court that he had never been provided with a copy of the Second Recording, and the Government's counsel stated that they had no knowledge that it existed prior to their Agent's trial testimony.  (*Id*. at 70.)  Agent Kavanagh stated that he had a copy of the Second Recording in his hotel room, and the Court ordered him to retrieve it over the lunch hour.  (*Id*. at 71.)  The Court then ordered the Government to produce the Second Recording to the Defendant as soon as it had a chance to review the same.  (*Id*. at 71-72.)  The Court informed defense counsel that he would be permitted to recall Agent Kavanagh if there was anything on the Second Recording that required follow up questioning.  (*Id*. at 72.)

The trial then resumed with Mr. Hutt continuing his cross-examination of Agent Kavanagh.  Later that day, outside the presence of the jury, the Government informed the Court that it had reviewed the Second Recording, and that it had played the Second Recording for Mr. Hutt.  (ECF No. 199 at 140-41.)  The Government explained that the Second Recording was generated by an internal recording system in the Grand Junction Field Office which, at the time of the interview, Agent Kavanagh did not know had been activated.  (*Id*.)  The Second Recording started about nine minutes before the First Recording.  (*Id*.)  The Government represented that these additional nine minutes contained only "background conversation" about what the Defendant wanted to eat, where the Defendant's luggage was, etc.  (*Id*. at 140-41.)  However, the Government acknowledged that, a few minutes into the Second Recording, there was a discussion about Defendant having invoked his right to an attorney in the car ride from the airport to the Field Office.  (*Id*.)  The Government stated that Defendant had re-initiated conversation with the agents, who then re-*Mirandized* the Defendant and had him sign an Advice of Rights form.  (*Id*. at 141.)  After the Defendant signed the Advice of Rights form (which was provided to the Defendant during discovery), Agent Kavanagh started the recording device which produced the First Recording.  (*Id*.)

At that time, Mr. Hutt did not disagree with the Government's characterization of the additional nine minutes that appear on the Second Recording.  (*Id*. at 141-42.)  He expressed disbelief at the Government's explanation about the failure to disclose the Second Recording, and said that he was not in a position, at that moment, to be able to say what sanction was appropriate, but that he wanted to raise the issue of sanctions.

(*Id*.)  The Court stated its belief that, because there was no indication that the Government's attorneys knew about the Second Recording before Agent Kavanagh's testimony on cross-examination, the failure to produce the Second Recording appeared to be inadvertent.  (*Id*. at 143.)  The Court informed Mr. Hutt that it was willing to conclude the trial day early so that he could have the evening to confer with the Defendant and to consider the impact of the Second Recording on his case.  (*Id*.)  The Court stated that it would hear further argument on this issue in the morning.  (*Id*.)

The following morning, Mr. Hutt informed the Court that he had the opportunity to review the Second Recording, both by himself and with his client.  (ECF No. 200 at 2.)  Mr. Hutt stated that, in his opinion, the nine additional minutes did not contain just small talk; rather, there were clear indications that the Defendant had invoked previously invoked his right to counsel.  (*Id*. at 3.)  Because that was "diametrically opposite" to what was disclosed during discovery, Mr. Hutt believed that he was in an "impossible situation".  (*Id*. at 2-3.)  Mr. Hutt introduced into evidence Agent Kavanagh's report describing the Defendant's arrest and interrogation, which was provided to the Defendant during discovery and which states that the Defendant waived his right to counsel and agreed to be interviewed.  (*Id*. at 4.)  The report fails to mention anything about Defendant invoking any of his *Miranda* rights.  (*Id*.)  Mr. Hutt explained that the first he learned that Defendant had invoked his right to counsel was during the cross-examination of Agent Kavanagh, and the late disclosure of the Second Recording prejudiced the Defendant by denying him the ability to challenge the admissibility of his taped interview by way of a pretrial motion to suppress.  (*Id*.)

At that point, the following exchange occurred:

> THE COURT:  What are the sanctions that you are seeking?
>
> MR. HUTT:  I have spent so much time since we left court yesterday trying to figure out what's the right thing to do here?  What can I ask for that is fair and appropriate under the circumstances?  And I will tell you, absolutely, that it is not asking for a mistrial, because a mistrial benefits them, and it hurts Mr. Wheeler, who has been in custody the entire time that this has been happening, and who likes this jury and who believes that they have listened to him, and that they have listened to me, and that we have the best chance of his getting a – an acquittal in this case, based on the fact that he – that we have a good jury here, and based on the testimony as it's come in.  Your Honor, I find this to be egregious, and I understand that it's not bad faith on the part of the lawyers.  I have every reason to believe that not coming up with a recorded statement of the defendant until the end of trial, and to have it come up in a way that is diametrically opposite to what you have said on paper is bad faith.
>
> THE COURT:  So how do we salvage this trial?
>
> MR. HUTT:  My request is that the Court dismiss the charges against Mr. Wheeler, and no one is going to be surprised that I ask for that, but I don't know what else to do, Your Honor.  I don't know what – what's – what's the sanction?  Well, they can't use it.  They hid it for a year and now they can't use it.  That's not a sanction.  Mistrial is not a sanction for them.

(*Id*. at 5-6.)  The Court probed further into why a mistrial would not be an appropriate sanction, and Mr. Hutt explained that he believed a mistrial would give the Government an opportunity to correct some of the mistakes it had made during its case-in-chief.  (*Id*. at 10-11.)  Mr. Hutt also argued that a mistrial would give the Government additional time to pull together evidence that the Court had excluded in this case because of its late disclosure.  (*Id*. at 10.)

In opposition to the Defendant's oral motion to dismiss the charges against him, the Government argued that the late disclosure of the Second Recording was not a discovery violation.  (*Id*. at 12-15.)  The Government also argued that Defendant could not show prejudice by the late disclosure because, even if Defendant had invoked his right to counsel, it was clear on the Second Recording that he had voluntarily resumed talking to the agents and, therefore, no constitutional basis existed to suppress the statement.  (*Id*. at 15-16.)  The Government suggested that Mr. Hutt could recall Agent Kavanagh as a witness, impeach him with his reports, and make him look like a "sloppy agent".  (*Id*. at 16.)

On rebuttal, Mr. Hutt emphasized that the prejudice to his client was the fact that he was denied the opportunity to litigate the admissibility of the First Recording—in which he admits posting the threatening comments to Facebook—during pretrial motion practice.  (*Id*. at 17.)  Mr. Hutt argued that, if the statement had been suppressed, he would have been trying "an entirely different case." (*Id*.)

The Court then took a recess and reviewed the Second Recording itself.  (*Id*. at 29.)  After going back on the record, the Court noted its concern with two statements on the Second Recording:  (1) a statement made by Agent Kavanagh right at the beginning of the Second Recording which amounted to "Are you willing to talk to us without an attorney?"; and (2) at the 5:20 mark, Agent Kavanagh told the Defendant that they needed to be sure that Defendant want to speak with the agents, "because of what [the Defendant] said to [the agents] in the car", following which Defendant was presented and signed the Advice of Rights form.  (*Id*. at 29-30.)

6

The Court then found that these statements were exculpatory, material, and that the failure to disclose them to Defendant during discovery was prejudicial.  (*Id*. at 30.) The Court then informed counsel that it intended to excuse the jury until the next morning so that the parties and the Court could have time to consider the appropriate sanction.  (*Id*.)  The Court permitted counsel to file any brief they thought necessary on the discovery violation and the possible sanctions by 3:00 p.m. that afternoon.  (*Id*.)  To help direct their briefing, the Court informed counsel that the sanctions it was considering were granting a mistrial or dismissing the indictment.  (*Id*.)

The Government then raised the point that neither party had moved for a mistrial, and asked whether the Court was considering granting a mistrial in the absence of a request for one.  (*Id*. at 31.)  In response, the Court directly asked both the Government and the Defendant if either was seeking a mistrial.  (*Id*. at 32.)  The Government unequivocally stated that it was not moving for a mistrial.  (*Id*.)  Mr. Hutt stated that he was not moving for a mistrial "at this point", but that he needed time to process the Court's findings.  (*Id*.)  The Court informed Mr. Hutt that, if he wanted to make a motion for mistrial, he should do so in his brief that was to be filed that afternoon.  (*Id*.)

That afternoon, the parties submitted the requested briefing.  (ECF Nos. 175-178.)  In the Defendant's brief, he stated: "Mr. Wheeler is **NOT** requesting that the Court declare a mistrial in this case and objects to a mistrial being granted."  (ECF No. 175 at 1 (emphasis in original).)  Defendant argued that the only sanction that would actually punish the Government for the late disclosure of the Second Recording was

dismissal of the indictment.  (*Id*. at 1-2.)  The Government's brief argued that there was no *Brady* violation or any other discovery violation and, therefore, no sanction was necessary.  (ECF No. 176.)  In the alternative, the Government argued that a continuance of the trial would be appropriate to permit Defendant time to investigate the details surrounding the Second Recording.  (*Id*. at 5.)

The next morning, day four of the jury trial, the Court issued its initial ruling on Defendant's oral motion to dismiss the Indictment.  (ECF No. 201 at 2.)  The Court noted that neither party had requested a mistrial, and that, in the absence of a motion, it did not find that there was manifest necessity to declare a mistrial.  (*Id*.)  The Court further found that a mistrial would not sanction the Government in any way, and would more likely prejudice the Defendant.  (*Id*.)  The Court found that a continuance would not sanction the Government, and would not meaningfully assist the Defendant, because the Defendant's interview had already been played to the jury and that bell could not be unrung.  (*Id*. at 3.)  The Court noted that the prejudice the Defendant suffered from the late disclosure of the Second Recording was that he may have been able to pursue an entirely different theory of the defense if his statement had been found inadmissible by way of pretrial motion practice, and that a continuance would not address that prejudice.  (*Id*.)

The Court noted that, with mistrial off the table and a continuance not providing any relief to the Defendant, it was left with the option of either dismissing the charges or letting the case go to the jury.  (*Id*. at 3-4.)  Citing *United States v. Scott*, 98 S.Ct. 2187 (1978), the Court stated that it was going to let the case go to the jury, and deal with

8

whether to dismiss the charges after the verdict was returned, if the jury found the Defendant guilty. (*Id*. at 4.) Accordingly, the Court reserved ruling on the Defendant's oral motion to dismiss the indictment. (*Id*.)

The Court then questioned the parties about what was left in the case, given this ruling. Mr. Hutt indicated that the Defendant was prepared to rest his case, and the Government stated that it would not have any rebuttal witnesses. (*Id*. at 7.) The trial proceeded to closing arguments, and the jury was excused to deliberate. (*Id*. at 85.) Approximately two hours later, the Court received the jury's verdict of guilty on both counts of the Superseding Indictment. (*Id*. at 86-87; ECF No. 181-7.) The Court set the Defendant's sentencing hearing for January 15, 2014. (ECF No. 201 at 92; ECF No. 181.)

After the jury was excused, the Court ordered the parties to submit supplemental briefing on the Defendant's motion to dismiss the Superseding Indictment. (ECF No. 201 at 93.) Defendant submitted his supplemental brief on October 11, 2013. (ECF No. 183.) The Government's response was filed on October 25, 2013 (ECF No. 186), and the Defendant filed a reply on November 4, 2013 (ECF No. 187). Despite the fact that Defendant had been convicted of the crimes charged, at this point Defendant still did not request a mistrial or otherwise move for a new trial.

## II. ANALYSIS

Defendant moves to dismiss the Indictment based on the Government's failure to disclose the existence of the Second Recording until the middle of the trial. Defendant contends that the late disclosure violates both Federal Rule of Criminal Procedure 16

9

and *Brady v. Maryland*, 373 U.S. 83 (1963).  The Court will address each of these contentions in turn below.

**A.     Rule 16**

Federal Rule of Criminal Procedure 16 is entitled "Discovery and Inspection" and sets forth the parties' respective duties with regard to discovery of relevant material in a criminal case.  The parties vigorously dispute whether the late disclosure of the Second Recording in fact violated Rule 16.  The Court finds that it need not decide this issue because, even assuming that the late disclosure was a discovery violation, such violation does not warrant the only relief sought by the Defendant, dismissal of the Superseding Indictment.

When it comes to the district court's attention that the government has failed to comply with Rule 16, "the court may order [the government] to permit the discovery or inspection, grant a continuance, or prohibit the [government] from introducing evidence not disclosed, or it may enter such other order as it deems just under the circumstances."  Fed. R. Crim. P. 16(d)(2).  "District courts have broad discretion to sanction a party who violates discovery orders."  *United States v. Golyansky*, 291 F.3d 1245, 1249 (10th Cir. 2002).

In selecting a proper sanction, the Court must consider "(1) the reasons the government delayed producing requested materials, including whether the government acted in bad faith; (2) the extent of prejudice to the defendant as a result of the delay; and (3) the feasibility of curing any prejudice with a continuance."  *United States v. Gonzales*, 164 F.3d 1285, 1292 (10th Cir. 1999) (citing *United States v. Russell*, 109

10

F.3d 1503, 1511 (10th Cir. 1997)).  "If after considering these factors the district court concludes sanctions are appropriate, it must impose the least severe sanction that will accomplish prompt and full compliance with the court's discovery orders." *United States v. Ivy*, 83 F.3d 1266, 1280 (10th Cir. 1996) (internal quotations omitted).

The Court finds that there is no evidence of bad faith in this case.  The Government's attorneys forcefully contended that they were unaware of the existence of the Second Recording until Agent Kavanagh's testimony during cross-examination, and the record is bereft of any evidence to the contrary.  On the other hand, Agent Kavanagh testified that he had provided the Second Recording to the prosecutors, and there is also no evidence that he was aware that it had not been provided to Defendant. (ECF No. 199 at 70.)  The possibilities for how this seemingly contradictory situation arose are endless; none suggest bad faith on the part of the Government's attorneys, and few suggest bad faith on the part of the agents.  For example, counsel for both the Government and the Defendant were brought into the case well after it began, and it is conceivable that in the transition between attorneys on either side, the existence of the Second Recording was lost in the shuffle.  It is also possible that, given the similarity between the First Recording and the Second Recording, the Government believed that they were the same and that, in disclosing the First Recording to Defendant, it had disclosed all versions of the Defendant's recorded statement.  Neither of these scenarios suggest any bad faith.

The Court acknowledges the possibility that Agent Kavanagh deliberately withheld the Second Recording from the prosecutors because it included reference to the fact that the Defendant had invoked his right to counsel.  This scenario suggests

11

bad faith on Agent Kavanagh's part.  However, there is no evidence to suggest that this was Agent Kavanagh's motivation, and any such finding by the Court would be pure speculation.  Moreover, the Court sees little reason for Agent Kavanagh to have intentionally withheld the Second Recording.  On the limited record before the Court, it is far from clear that, had the Second Recording been disclosed to counsel, Defendant's statement would necessarily have been suppressed.  The Government's argument that Defendant re-initiated contact with the agents after invoking his right to counsel certainly finds some support in the audio statements captured on the Second Recording.  In the Court's experience, criminal suspects frequently invoke *Miranda* rights, and then later change their mind and waive the same.  Thus, the outcome of any hypothetical motion to suppress the Defendant's statement is certainly far from clear.

Additionally, the Defendant's statement in this case was not "smoking gun" evidence against him.  This is not a case in which suppression of the Defendant's statement would have dismantled the whole prosecution.  Indeed, until days before trial, the Government did not intend to even introduce the recorded statement.  (*See* ECF No. 186-1.)

Because the Second Recording was not evidence worth risking an entire case over, the Court finds it hard to believe that Agent Kavanagh would have intentionally withheld it from Government prosecutors.  The Court believes that it is far more likely that the failure to disclose the Second Recording was inadvertent, either because Agent Kavanagh mistakenly believed he had provided it to the prosecutors when he had not, or because the prosecutors mistakenly believed that the Second Recording was a copy of the First Recording rather than a separate recording that was longer by nine minutes.

12

In any event, while the Court certainly does not condone the Government's handling of the Second Recording in this case, the Court finds that there is no evidence that the late disclosure of the Second Recording was in bad faith.  Thus, the first factor does not militate in favor of a harsh sanction.

With respect to the remaining two factors, the Court has already found that Defendant was prejudiced by the late disclosure of the Second Recording, and that a continuance would not have cured the prejudice.  The Court sees no reason to reconsider these findings.  There is no doubt that, had the Second Recording been disclosed to Defendant during discovery, he could have challenged the admissibility of his recorded statement.  While the particular disposition of a motion to suppress may not have been entirely clear, there was certainly a possibility that the Court could have granted the motion, which would have precluded admission of the statement at trial. The late disclosure of the Second Recording denied Defendant the opportunity to raise its admissibility during pretrial motion practice, which certainly prejudiced the Defendant.  Moreover, because the existence of the Second Recording was not revealed until after the Defendant's statement was played to the jury, neither a continuance nor exclusion of the statement at that point would have cured the Defendant's prejudice.

Thus, under the three-factor test set forth by the Tenth Circuit, the Court finds that the late disclosure of the Second Recording is sanctionable conduct.  The question therefore becomes whether the only sanction requested here—dismissal of the indictment with prejudice—is the appropriate sanction.

The Tenth Circuit has repeatedly held that, in the absence of bad faith, dismissal of an indictment is too severe a sanction for a discovery violation. *See, e.g., United States v. Robertson*, 45 F.3d 1423, 1440 (10th Cir. 1995) ("[T]he drastic remedy of vacating a conviction for the violation of a discovery order is not warranted here, particularly in light of the fact that no bad faith has been alleged or found."); *United States v. Dennison*, 891 F.2d 255, 260 (10th Cir. 1989) ("A duly returned grand jury indictment should not be dismissed for subsequent conduct of a government attorney"); *United States v. Evans & Assocs. Constr. Co., Inc.*, 839 F.2d 656, 660 (10th Cir. 1988) (holding that the district court's dismissal of the entire indictment as a sanction for the government's failure to comply with the court's discovery orders was "too extreme" and remanding for consideration of other sanctions).  Because the Court has found no evidence of bad faith in this case, the Court does not find that dismissal of the Superseding Indictment is appropriate.

Moreover, as noted above, where there has been a discovery violation, the Court must impose the least severe sanction that will remedy the prejudice.  *See Ivy*, 83 F.3d at 1280.  In this case, the prejudice to Defendant would not have been cured by a continuance, which the most common remedy for a discovery violation.  However, the prejudice to Defendant could have been cured by way of a mistrial, which would have permitted the Court to reopen pretrial motions practice to consider the admissibility of the Defendant's statement, given the revelations contained in the Second Recording.  This relief would have been tailored to curing the prejudice caused by the discovery violation, and is far less severe than dismissal of the indictment.

14

As such, the Court finds that, even assuming the late disclosure constituted a discovery violation, the only remedy requested by Defendant—dismissal of the indictment—is not warranted here.

**B.     *Brady* Violation**

In *Brady v. Maryland*, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  373 U.S. at 87.  Evidence is "material" within the meaning of *Brady* "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Young*, 45 F.3d 1405, 1408 (10th Cir. 1995) (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)).  "Impeachment evidence as well as exculpatory evidence falls within the Brady rule."  *Young*, 45 F.3d at 1408 (citing *Giglio v. United States*, 405 U.S. 150, 154 (1972)).

*Brady* material must be disclosed to a defendant at such time as he can make use of it for his defense.  *See United States v. Scarborough*, 128 F.3d 1373, 1376 (10th Cir. 1997).  The precise timing of this disclosure depends on the nature of the *Brady* evidence.  *Id*.  For example, exculpatory evidence which requires investigation must be disclosed in advance of trial, at such time as to permit the defendant to use it in fashioning a trial strategy.  *See United States v. Burke*, 571 F.3d 1048, (10th Cir. 2009); *see also United States v. Devin*, 918 F.2d 280, 290 (1st Cir. 1990) (explaining that a *Brady* violation would occur if delayed disclosure altered defense strategy and timely

disclosure would likely have resulted in a more effective strategy).

The parties dispute whether the Second Recording constitutes *Brady* material, including whether it was exculpatory and whether it was material.  The parties also dispute whether the failure to disclose the Second Recording until the middle of trial was a *Brady* violation.  The Court finds that it need not resolve this dispute because, even if the Court assumes that the Second Recording was *Brady* material and the Government's failure to disclose it was a *Brady* violation, dismissal of the indictment remains an inappropriate sanction.

The Tenth Circuit has held that the most drastic remedy for a *Brady* violation involving the late disclosure of evidence is a new trial at a time in which the defendant could make use of the withheld information.  *See United States v. Davis*, 578 F.2d 277, 280 (10th Cir. 1978) ("Assuming *arguendo* that nondisclosure at the first trial of the note written by Andrus was indeed a violation of the principles laid down in *Brady*, the most an invocation of *Brady* could accomplish would be the ordering of a new trial in which the withheld information is fully disclosed.")  Dismissal of an indictment is appropriate only where the government has destroyed or disposed of *Brady* material, because such destruction is a permanent deprivation of Due Process.  *See United States v. Bohl*, 25 F.3d 904, 914 (10th Cir. 1994) ("Unlike cases in which the prosecutor fails to disclose *Brady* material, where a court may order a new trial at which the undisclosed evidence can be introduced, the disposition of evidence that is central to the case may permanently deprive the defendant of due process."); *see also United States v. Fletcher*, 801 F.2d 1222, 1226 (10th Cir. 1986) (holding that, even where exculpatory

evidence was destroyed, dismissal of the indictment is not always an appropriate sanction).

In this case, there is no allegation that any *Brady* material was destroyed by the Government; rather, it was produced to the Defendant during trial.  Therefore, even assuming it was a violation of *Brady*, it did not amount to a permanent deprivation of Defendant's Due Process rights.  The prejudice caused by the late disclosure could be remedied by a new trial, prior to which the Defendant would be able to challenge the voluntariness of his statement.  Dismissal of the indictment is too severe a sanction in this situation.

Defendant has repeatedly stated that he is not asking for a mistrial or a new trial; the only relief he seeks is dismissal of the Superseding Indictment.  Notably, Defendant's post-trial briefing—filed after the jury returned its guilty verdict—still does not seek a new trial.  Defendant also has not filed a motion for new trial, and the time for doing so has long since passed.  *See* Fed. R. Crim. P. 35(b) ("Any motion for a new trial grounded on any reason other than newly discovered evidence must be filed within 14 days after the verdict or finding of guilty.").  Because the Court finds that dismissal of the indictment is too severe a sanction for the late disclosure of the Second Recording in this case, Defendant's all-or-nothing approach leaves the Court unable to offer him any relief.

## III.  CONCLUSION

For the reasons set forth above, Defendant's oral motion to dismiss the superseding indictment is DENIED.

17

Dated this 7th day of January, 2014.

BY THE COURT:

William J. Martinez
United States District Judge